# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

v.

No. 04-5887

KEVIN MCCLAIN; GEORGE BRANDT; JASON DAVIS,
*Defendants-Appellees.*

>

---

Filed: March 31, 2006

Before: BOGGS, Chief Judge; BATCHELDER and GIBBONS, Circuit Judges.

---

**ORDER**

---

This matter comes before the court upon the petitions for rehearing, with suggestion for rehearing *en banc*, filed by the appellees, and the response of the appellant thereto. The petitions have been circulated not only to the original panel members but also to all other judges of the court in regular active service, less than a majority of whom have voted in favor of rehearing en banc. Accordingly, the petitions have been returned to the panel for decision.

Upon consideration of the petitions and the response the panel concludes that the issues raised therein were fully considered upon the original submission and decision of the case, and each of the requests for rehearing is therefore denied. In addition, Chief Judge Boggs has revised the penultimate paragraph of his opinion concurring with the decision of December 2, 2005, and copies of that decision and the revised concurrence are attached hereto.

---

[*]Judge Daughtrey recused herself from participation in this ruling.

1

BOYCE F. MARTIN, JR., Circuit Judge, with whom MOORE, COLE, and CLAY, Circuit Judges, join, dissenting from the denial of rehearing en banc.

Because the Fourth Amendment already has more holes in it than a piece of Swiss cheese and the panel's decision adds another errantly-fired cannon-ball sized hole, I dissent from the Court's decision denying rehearing en banc. The panel's decision makes several errors: (1) It misunderstands the purpose and rationale of the good-faith exception to the exclusionary rule announced in *United States v. Leon*, 468 U.S. 897 (1984); (2) It ignores this Circuit's precedent, particularly in an opinion published ten days before the panel's decision in this case, *see United States v. Davis*, 430 F.3d 345 (6th Cir. 2005); (3) It overstates the magnitude of the purported circuit split; (4) It relies upon the Eighth Circuit's precedents in *United States v. White*, 890 F.2d 1413 (8th Cir. 1989), *United States v. Kiser*, 948 F.2d 418 (8th Cir. 1991), and *United States v. Fletcher*, 91 F.3d 48 (8th Cir. 1996), but ignores the fact that those decisions have been severely undermined and limited by other Eighth Circuit decisions, such as *United States v. O'Neal*, 17 F.3d 239 (8th Cir. 1994); and (5) In adopting the Eighth Circuit's undermined precedent, it fails to correctly apply it, by using internally inconsistent logic, leading to the wrong result. For all of these reasons, the panel's decision is incorrect and it undermines both the purposes of the exclusionary rule and the good-faith exception, and I therefore dissent from the Court's decision not to rehear the case en banc.

## I.

### A.    *Leon & The Good-Faith Exception*

In *Leon*, the Supreme Court addressed the "question whether the Fourth Amendment exclusionary rule should be modified so as not to bar the use in the prosecution's case in chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause." *Leon*, 468 U.S. at 900. The case arose when police, using a confidential informant, began investigating two individuals suspected of drug trafficking. *Id.* at 901. During the investigation the police conducted surveillance of three residences and discovered that cars parked at the residences and cars visiting the residences belonged to individuals previously arrested for possession of marijuana. *Id.* A check of one of the individual's probation records led the police to Alberto Leon, who likewise had a previous arrest for drug charges, and at the time of the prior arrest, the police had information that Leon was heavily involved in drug importation into the United States. *Id.* Police then witnessed several persons arriving at the residences and leaving with small packages, as well as two individuals leaving Los Angeles on flights to Miami, a known drug source city. *Id.* at 902. The pair, upon returning, were discovered with small amounts of marijuana. *Id.* On the basis of these facts, the officers prepared an affidavit requesting a search warrant, had it reviewed by several Deputy District Attorneys, and submitted it to a magistrate. *Id.* The magistrate then issued a facially valid search warrant, the searches were conducted, and the officers discovered large quantities of drugs and other evidence sufficient to charge the defendants with conspiracy to possess and distribute cocaine and various other counts. *Id.*

The defendants filed a motion to suppress which was granted in part by the district court. *Id.* at 903. The court concluded that the affidavits were insufficient to establish probable cause and that the magistrate had erred by issuing the warrants. *Id.* A divided panel of the Ninth Circuit affirmed, agreeing that the affidavit lacked probable cause and that the magistrate erred by issuing the warrant. *Id.* at 904. The Ninth Circuit also declined the government's request to recognize a good-faith exception to the exclusionary rule. *Id.* at 905. The government filed a petition for certiorari, expressly declining to seek review over the probable cause determination and presenting only the question of "[w]hether the Fourth Amendment exclusionary rule should be modified so as not to bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant

that is subsequently held to be defective." *Id.* It was in this posture that the Supreme Court reviewed the case.

To determine whether the good-faith exception ought to exist, the Court determined that it must "weigh[] the costs and benefits of preventing the use in the prosecution's case in chief of inherently trustworthy tangible evidence obtained in reliance on a search warrant issued by a detached and neutral magistrate that ultimately is found to be defective." *Id.* at 907. In weighing the costs and benefits, the Court recognized the "substantial social costs" of the exclusionary rule because of its interference with the truth-seeking functions of judge and jury. *Id.* (citing *United States v. Payner*, 447 U.S. 727, 734 (1980)). Further, when officers act in good faith, granting defendants an exclusionary privilege that results in a windfall undermines and "offends basic concepts of the criminal justice system." *Id.* (citing *Stone v. Powell*, 428 U.S. 465, 490 (1976)). Because of the high societal cost of exclusion, the Court determined that "[c]lose attention" must be paid to the "remedial objectives" and purposes behind the exclusionary rule. *Id.* at 908.

The remedial objective of the exclusionary rule, pure and simple, is deterring police misconduct. *Id.* at 916. The rule is not designed to punish the errors of judges and magistrates. *Id.* (noting that "there exists no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion"). Thus, to have any purpose, the exclusion of unlawfully obtained evidence "must alter the behavior of individual law enforcement officers or the policies of their departments." *Id.* at 918. With these factors balanced, the Court determined that "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Id.*[1] Thus, when the remedial objective of the Fourth Amendment will be served, exclusion is the appropriate remedy. When no deterrence can be expected to result from suppression, then society ought not be forced to bear the cost of exclusion.

The Court found that when officers act in objective good-faith reliance on the determinations of a magistrate, suppression "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity." *Id.* at 919. *Leon* acknowledges that suppression of evidence based on the errors of a magistrate serves no deterrent purpose upon police officers' conduct, and therefore, suppression is not justified in those circumstances. This approach recognizes that "[r]easonable minds frequently may differ on the question of whether a particular affidavit establishes probable cause," and therefore, when police officers rely, in objective good-faith, on a detached and neutral magistrate's determination of probable cause, but a court later finds the magistrate's conclusions to be in error, a punishment inflicted upon the police officers and society serves no purpose. *Id.* There are, of course, exceptions to this rule to guard against abuse.[2]

---

[1] It is highly relevant to point out the posture of *Leon*. Officers investigated and accumulated facts which they believed amounted to probable cause. They prepared an affidavit and presented it to a magistrate who agreed. The warrant was later found to be invalid after the officers relied in good faith upon the magistrate's conclusions and executed the search. *Leon* was not a case, like *McClain*, where the officers first violated the Fourth Amendment and then sought to play nice afterwards. *Leon* controls our decision when magistrates err and officers rely in objective good-faith. It does not purport to address the issue of *police error*. To the extent that it does, *Leon*'s clear command that suppression is the remedy if it will deter police misconduct, controls here to deter the *police error* that occurred.

[2] First, deference to a magistrate "does not preclude inquiry into the knowing or reckless falsity of the affidavit upon which that determination was based." *Leon*, 468 U.S. at 914 (citing *Franks v. Delaware*, 438 U.S. 154 (1978)). Second, a magistrate must remain neutral and detached and cannot serve as a rubber-stamp for the police. *Id.* (citing *Aguilar v. Texas*, 378 U.S. 108, 111 (1964)). Third, reviewing courts will not defer to a magistrate's finding of probable cause where the affidavit does not "provide the magistrate with a substantial basis for determining the existence of probable cause." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 239 (1983)).

Furthermore, as the Court very clearly noted in *United States v. Peltier*, 422 U.S. 531, 539 (1975):

> The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force.

The purposes of the exclusionary rule are served where "it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Id.* at 542. Thus, the good-faith exception is particularly appropriate "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope. . . . In most such cases, there is no police illegality and thus nothing to deter." *Leon*, 468 U.S. at 920-21. Stated another way, "[p]enalizing the officer for the magistrate's error, *rather than his own*, cannot logically contribute to the deterrence of Fourth Amendment violations." *Id.* at 921 (emphasis added).

And, finally, applying these principles in *Leon* itself, the Court found that suppressing the evidence, based on the magistrate's erroneous determination that the facts in the affidavit established probable cause, would serve no deterrent purpose on the police. The police had done nothing wrong and nothing illegal. They had conducted lawful surveillance and submitted this information to a magistrate who determined that probable cause existed for a search warrant. *Id.* at 925-26. They then properly executed the warrant and discovered incriminating evidence. *Id. Leon*, therefore, presents the quintessential good-faith exception case — proper police conduct, a magistrate's error, and objective good-faith police reliance on the magistrate's determination. In these circumstances, where the magistrate's determination is later found to be erroneous, suppressing the evidence will do nothing to deter police conduct, because the police did not do anything unlawful.

### B.          *The Panel Misconstrues Leon*

Starting at the beginning, *Leon* is not even directly on point in this case. As demonstrated above, *Leon* addressed a situation of entirely lawful police investigation culminating in good-faith reliance on a magistrate's erroneous determination that probable cause existed to issue the search warrants. That is, there was (1) a lawful investigation, (2) an application for a warrant, (3) a magistrate's determination that the affidavit contained probable case and the warrants were issued, (4) searches conducted and objective good-faith reliance on the magistrate's determination, and (5) a court's later determination that the magistrate erred in determining that the facts in the affidavit amounted to probable cause. In *Leon*, the police did not ever violate the law. They simply relied in good faith on a magistrate's error. In this case, however, there was (1) *first* an *illegal warrantless search* of the defendant's home, *then* (2) additional surveillance based on the information obtained as a result of the illegal search, and (3) a warrant application relying entirely on the evidence obtained as a result of the first illegal search and the fruits obtained therefrom. The panel's decision fails to account for this crucial and determinative difference between *Leon* and the case before us.

The second crucial error is the panel's failure to distinguish, as *Leon* instructs, between errors by judges and magistrates, and errors by police officers. The deterrence rationale, *Leon* holds, is not applicable to errors by judges and magistrates. When police misconduct occurs, however, the deterrence rationale is at its apex. "Good faith is not a magic lamp for police officers to rub whenever they find themselves in trouble." *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996). In this case, the police conducted a warrantless and presumptively unconstitutional search

of the defendant's home. *Payton v. New York*, 445 U.S. 573, 585 (1980). This is a clear Fourth Amendment violation by *police officers*. *Leon* instructs us to pay "[c]lose attention" to the "remedial objectives" of the exclusionary rule, and apply it only in those cases where the purpose of deterrence can be furthered. *Leon*, 468 U.S. at 908, 918. This is precisely such a case.[3] It is *not*, as *Leon* was, a case where "an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *Id.* at 920-21. The panel further errs in this respect by acknowledging the deterrence rationale — by paying lip service to it — but failing to discuss its relevance to this case. Instead, the panel decision provides the police with their magic lamp.

Without going any further than *Leon* itself, the panel should have suppressed the evidence obtained during the illegal search of the defendant's home. The panel notes, however, as have many courts, that an additional "wrinkle," exists — reconciling the fruit of the poisonous tree doctrine, *see Nardone v. United States*, 308 U.S. 338, 341 (1939); *Segura v. United States*, 468 U.S. 796, 804 (1984), with the good-faith exception. This is because the evidence obtained from the unconstitutional warrantless search of the home was used to conduct additional surveillance and ultimately in an affidavit seeking a warrant to search 123 Imperial Point and five other properties identified through the investigation and surveillance.[4] With this in mind, it is helpful to turn to our precedent and other courts' precedent reconciling these two doctrines.

## II.

### A.     *This Court's Precedent*

The panel claims that this is an issue of first impression in this Court. That is not my take on it. In *United States v. Davis*, 430 F.3d 345 (6th Cir. 2005), a case published on November 22, 2005, ten days prior to this case's publication, we addressed the issue of whether a prior warrantless search tainted the subsequent search, pursuant to a warrant, of the defendant's car or whether the subsequent search warrant cured the underlying constitutional violation. We held that the "search of [the defendant's] vehicle was tainted by the [prior] illegal search, and thus the search warrant was insufficient to overcome this constitutional defect." *Id.* at 357-58. The remedy was to "remove [the illegally seized evidence] from the affidavit when considering whether there is still sufficient information to establish probable cause." *Id.* (citing *United States v. Reilly*, 76 F.3d 1271, 1282-83 n.2 (2d Cir. 1996) (discussed *infra*)).[5] Finally, though the government did not argue the point, we noted our "agree[ment] with the numerous other circuits that have held that the *Leon* good-faith exception is inapplicable where a warrant was secured in part on the basis of an illegal search or seizure." *Id.* at 358 n.4 (citing *Reilly*, 76 F.3d at 1282; *United States v. Bishop*, 264 F.3d 919, 924 n.2 (9th Cir. 2001)).

---

[3] Furthermore, this case fits squarely within *Peltier*'s statement that "[t]he deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused." 422 U.S. at 539. In this case, the warrantless search of the defendant's home, the "chief evil" against which the Fourth Amendment protects, is at the very least negligent, and more likely than not, reckless. This is precisely the type of case which *requires* suppression of the tainted evidence.

[4] This is to mean therefore that the evidence obtained from the search of the home should be stricken from the affidavit. Because the district court determined, and I agree, that all of the remaining evidence was fruit of the poisonous tree, the evidence must be suppressed. Thus, viewing the search warrant without the fruits reveals essentially a blank piece of paper, which, even with a magic lamp, cannot constitute probable cause.

[5] This, of course, assumes that the other evidence satisfies one of the exceptions to the fruit of the poisonous tree doctrine — independent source, attenuation, or inevitable discovery.

Additionally, though not binding upon us, a district court in this Circuit has given thoughtful and persuasive consideration to this issue in nearly *identical* circumstances — that is, a prior warrantless search of a home where evidence is seized and later used to obtain a search warrant. After its consideration, the district court held that the evidence must be suppressed and the good-faith exception did not apply. *See United States v. Meixner*, 128 F. Supp. 2d 1070 (E.D. Mich. 2001). In *Meixner*, the police conducted a warrantless search of the defendant's home. The government did not rebut the presumption of unconstitutionality and proved no more than that there was a mere possibility of an emergency. *See United States v. Ukomadu*, 236 F.3d 333 (6th Cir. 2001). Reviewing *Leon*, the court noted that "where a search warrant is declared invalid because of a technical defect or an adverse reassessment of a magistrate's probable cause decision, the deterrent effect is so remote that its cost cannot be justified." *Meixner*, 128 F. Supp. 2d at 1076; *id* ("Where the mistake in evaluating probable cause is made by the magistrate, not the police officer, . . . excluding evidence will not deter future police misconduct.").

The court also properly interpreted *Leon*, in contrast to the panel here, by noting that "[t]he *Leon* decision itself dealt only with search warrants that were technically deficient or which were issued on the basis of affidavits that did not quite measure up to later examination for probable cause. It did not attempt to reconcile the newly-announced good faith exception with the 'fruit of the poisonous tree' doctrine stated in *Wong Sun*." *Id.* (citations omitted). The district court also properly focused on whether suppression would further the interests of the exclusionary rule — that is, whether suppressing the evidence would deter police misconduct. "In this case, [the officer]'s unlawful conduct supplied the information which went to the heart of the probable cause determination. . . . [The officer]'s discovery was made during a warrantless entry into a private home, an entry that was presumptively unreasonable. Further, since there is a heightened expectation of privacy in one's own dwelling and a physical intrusion into one's home 'is the chief evil' addressed by the Fourth Amendment, the exclusionary rule emerges as an effective deterrent." *Id.* at 1077-78 (internal citations omitted).

Because this Court's statements in *Davis* and the decision in *Meixner* are correct and one panel cannot overrule the decisions of another panel, the *McClain* panel erred not only by failing to acknowledge and address the cases, but in concluding otherwise. The panel's reasoning is suspect and does not withstand scrutiny.

## III.

### A.       *The Panel Overstates the Magnitude of the Purported Circuit-Split and Adopts the Most Extreme Position of any Circuit*

The panel claims that in addressing the fruit of the poisonous tree doctrine and the good-faith exception, the Ninth and Eleventh Circuits have excluded the evidence, but the Second and Eighth Circuits "have held that, at least under some circumstances, the *Leon* good faith exception can still apply when the warrant affidavit relies on evidence obtained in violation of the Fourth Amendment." *United States v. McClain*, 430 F.3d 299, 307-08 (6th Cir. 2005). It is true that the Ninth and Eleventh Circuits have held that the good faith exception does not apply in these circumstances. The Second Circuit's decisions, however, are much closer to the Ninth and Eleventh Circuits than the Eighth — the Second Circuit has *not* held that evidence *is* admissible in these circumstances. Rather, it has merely declined to hold that the evidence is *never* admissible in these circumstances. The only circuit upon which the panel may conceivably rely is the Eighth Circuit; but, the Eighth Circuit cases relied upon have been limited and undermined by its other decisions. And, even applying the Eighth Circuit's undermined precedent, the panel still should have reached the opposite conclusion. Moreover, the panel failed to consider or discuss additional authority from other courts that have considered the issue here.

### i.        *The Second Circuit's Decisions*

I will start by discussing the Second Circuit's decisions, which, contrary to the panel's characterization, support my position and undermine theirs.  The Second Circuit's most extensive analysis of the issue came in *United States v. Reilly*, 76 F.3d 1271 (2d Cir. 1996) (noting that the "[g]ood faith [exception] is not a magic lamp for police officers to rub whenever they find themselves in trouble").  *Reilly* involved a warrantless search onto the defendant's property into protected curtilage.  *Id.*  The police officers observed and smelled what they believed to be a marijuana growing operation.  They then sought a warrant from a magistrate while disclosing some circumstances of their prior warrantless search and not disclosing other aspects.  The magistrate issued the warrant, the search was conducted, and the officers discovered marijuana.  The Second Circuit later held that the initial warrantless search was onto the curtilage of the defendant's property and therefore violated the Fourth Amendment.  *Id.* at 1279.  The issue  before the court then, was the same issue that was before the panel is this case.

The Second Circuit ordered the evidence suppressed, relying in part upon the police officers' failure to disclose to the magistrate all the circumstances of their prior illegal search.  But, the court found "an additional reason why *Leon* d[id] not shield the evidence" in that case.  *Id.* at 1280.  That reason was based on the precise circumstances here: "The issuance of the warrant was itself premised on material obtained in a prior search that today's holding makes clear was illegal."  *Id.*  The court noted — and the panel relies upon this statement — that it was "not hold[ing] that the fruit of illegal searches can *never* be the basis for a search warrant that the police subsequently use in good faith."  *Id.* (emphasis added).  It did not speculate on when those circumstances might arise, but noted that it need not reach the question because *Leon* commands courts to exclude evidence only on a case-by-case basis where "exclusion will further the purposes of the exclusionary rule." *Id.* at 1280-81 (quoting *Leon*, 468 U.S. at 918); *id.* ("We take that caution seriously and today go no further than to hold that the purposes of the exclusionary rule are served by exclusion of the evidence in this particular case.").

The Second Circuit drew a clear distinction, as discussed above, that the panel here fails to appreciate.  Because the exclusionary rule is designed to deter *police* misconduct and this goal is not furthered by suppression of evidence obtained under a warrant issued but later found to be defective, *Leon*, 468 U.S. at 918, had the police simply innocently investigated based on a warrant later found to be invalid, the evidence would accordingly be admitted.  *Reilly*, 76 F.3d at 1281.  "But it is one thing to admit evidence *innocently* obtained by officers who rely on warrants later found invalid due to a magistrate's error.  It is an entirely different matter when the officers are *themselves* ultimately responsible for the defects in the warrant."  *Id.*  This is precisely the distinction I have discussed above that controls this case and precisely what the panel fails to appreciate.  The case here involved police misconduct that the exclusionary rule seeks to deter and accordingly, the exclusionary rule should be applied.

Moreover, the *Reilly* court distinguished one if its prior decisions in *United States v. Thomas*, 757 F.2d 1359 (2d Cir. 1985), upon which the panel once again relies.  *Thomas*, however, lends no support to the panel's disposition.  That case involved an officer who sought a warrant based upon three factors: (1) a canine sniff outside of the defendant's apartment, (2) reliance on an informant's tip that the defendant was a narcotics dealer, and (3) that the defendant had acted suspiciously when arrested the previous day.  *Id.* at 1366.  The Second Circuit held that neither (2) nor (3) supported probable cause and that (1), the canine sniff, violated the Fourth Amendment.  *Id.* at 1366-67.  Nevertheless, the court found that *Leon* permitted the evidence to be admitted.  *Id.* at 1368.  This factual and legal situation is entirely different from that addressed in *Reilly* or by the panel here.  Until *Thomas* was decided, no court in the Second Circuit had held that canine sniffs violated the Fourth Amendment. *Reilly*, 76 F.3d at 1281 (citing *United States v. Place*, 462 U.S. 696, 707 (1983) (holding that a canine sniff is "*sui generis*" and "much less intrusive than a typical search")).  Thus,

unlike the officers in *Reilly* and unlike the officers in the case before the panel, the officer in *Thomas* "did not have any significant reason to believe that what he had done was unconstitutional." *Reilly*, 76 F.3d at 1281 (citing *Thomas*, 757 F.2d at 1368). When admitting the evidence, the Second Circuit explicitly stated that "[t]here [was] nothing more the officer could have or should have done under these circumstances to be sure his search would be legal." *Id.* (quoting *Thomas*, 757 F.2d at 1368).

Not so in this case. It cannot credibly be argued that the officers conducting a warrantless search of the defendant's home had "no significant reason" to believe that what they were doing might be unconstitutional. The officers in *Reilly* and the officers here had every reason in the world to know that their search was potentially, if not emphatically, illegal. There is nothing more clear under the Fourth Amendment than that it "unequivocally establishes the proposition that '[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Payton*, 445 U.S. at 590 (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961); *Semayne's Case*, 5 Coke Rep. 91a, 91b, 77 Eng. Rep. 194, 195 (K.B. 1604) ("the house of every one is to him as his castle and fortress, as well as his defence against injury and violence, as for his repose"); William Blackstone, 4 Commentaries on the Laws of England 223 (1765-1769) (noting that "the law of England has so particular and tender a regard to the immunity of a man's house, that it styles it his castle, and will never suffer it to be violated with impunity"). No officer could claim not to understand this principle.[6]

With a review of the Second Circuit's decisions, it is evident that they do not support the result reached by the majority, even in their most generous terms. Rather, applying the Second Circuit's decisions to the facts here results unequivocally in suppression of the evidence. The good-faith exception does not apply here.

### ii.     *The Ninth Circuit's Decision*s

Likewise, the Ninth Circuit has reached the correct conclusion — the opposite conclusion reached by the panel. *United States v. Vasey*, 834 F.2d 782, 788 (9th Cir. 1987), was that court's first review of the issue. In *Vasey*, like *Reilly*, and the case before the panel, the police officer

---

[6] Likewise telling is the fact that, if the officers in this case had conducted their warrantless search of the home, pursuant to a state statute, not yet declared unconstitutional, Supreme Court precedent requires suppression of the evidence. *See Leon*, 468 U.S. at 912 n.8 ("We have held, however, that the exclusionary rule requires suppression of evidence obtained in searches carried out pursuant to statutes, not yet declared unconstitutional, purporting to authorize searches and seizures without probable cause or search warrants.") (citing *Ybarra v. Illinois*, 444 U.S. 85 (1979); *Torres v. Puerto Rico*, 442 U.S. 465 (1979); *Almeida-Sanchez v. United States*, 413 U.S. 266 (1973); *Sibron v. New York*, 392 U.S. 40 (1968); *Berger v. New York*, 388 U.S. 41 (1967)). Suppression is appropriate in these circumstances because "[t]hose decisions involved statutes which, by their own terms, authorized searches under circumstances which did not satisfy the traditional warrant and probable-cause requirements of the Fourth Amendment." *Michigan v. DeFillippo*, 443 U.S. 31, 39 (1979).

Thus, had the officers arrived at the defendants' home in this case and conducted a warrantless search pursuant to a state statute authorizing them to do so, and had used the evidence they discovered in order to obtain a later search warrant, the Supreme Court's precedent requires suppressing that evidence. The logic of those decisions requires the same outcome here. Furthermore, *Murray v. United States*, 487 U.S. 533 (1988), while not directly on point, lends credence to my conclusion that suppression is required here. There, officers made a warrantless, illegal entry into a warehouse. They observed what appeared to be contraband, left the premises, and obtained a search warrant. The Court noted that "[t]he ultimate question, therefore, is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here. This would not have been the case if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." *Id.* at 542. The Court found the evidence admissible in *Murray*, because of the independent source rule — here, however, there is no independent source that justifies admission of the evidence, and therefore this case requires suppression of the evidence.

conducted an initial warrantless search and later used evidence from that search in an affidavit in support of a search warrant.  *Id.* at 788-89.  The court properly interpreted *Leon* and found it inapplicable in these circumstances.  *Id.* at 788.  That is, "[t]he fact that Officer Jensen conducted a warrantless search of the vehicle which violated Vasey's Fourth Amendment rights precludes any reliance on the good faith exception."  *Id.*  Thus, unlike in *Leon*, where the officer presented *lawfully obtained* evidence to a neutral magistrate, and the magistrate erred in finding that the evidence established probable cause, the evidence in *Vasey* that was included in the affidavit was *un*lawfully obtained.  "The constitutional error was made by the officer in this case, not by the magistrate as in *Leon*.  The *Leon* Court made it very clear that the exclusionary rule should apply (i.e. the good faith exception should not apply) if the exclusion of evidence would alter the behavior of individual law enforcement officers or the policies of their department."  *Id.* at 789.  Thus, in a holding directly applicable to the case here, the Ninth Circuit held that the officer's "conducting an illegal warrantless search and including evidence found in this search in an affidavit in support of a warrant is an activity that the exclusionary rule was meant to deter."  *Id.*

Finally, the court addressed and rejected an additional basis that the panel relied upon here — that the unlawful search was disclosed to the magistrate.  This factor, the court persuasively reasoned, does not sanitize the taint.

> A magistrate's role when presented with evidence to support a search warrant is to weigh the evidence to determine whether it gives rise to probable cause.  A magistrate evaluating a warrant application based in part on evidence seized in a warrantless search is simply not in a position to evaluate the legality of that search.  Typically, warrant applications are requested and authorized under severe time constraints.  Moreover, warrant applications are considered without the benefit of an adversarial hearing in which the evidentiary basis of the application might be challenged.  Although we encourage magistrates to make all possible attempts to ensure that a warrantless search was legal before relying on the fruits of that search, we are mindful of the limitations on a magistrate's fact-finding ability in this context.  We therefore conclude that a magistrate's consideration does not protect from exclusion evidence seized during a search under a warrant if that warrant was based on evidence seized in an unconstitutional search.  Accordingly, the good faith exception should not and will not be applied to the facts of this case.

*Id.* at 789-90; *see also United States v. Gray*, 302 F. Supp. 2d 646, 653 (S.D. W.Va. 2004) ("Regardless of whether an officer concealed or confessed the circumstances of the predicate search, he should bear responsibility for any illegality occurring prior to the issuance of the warrant.  A magistrate's chambers is not a confessional in which an officer can expiate constitutional sin by admitting his actions in a well-drafted warrant application.").

The Ninth Circuit re-affirmed its conclusions in *United States v. Wanless*, 882 F.2d 1459, 1466 (9th Cir. 1989).  *See also United States v. Reed*, 15 F.3d 928, 933 (9th Cir. 1994) (holding that observations made during a prior illegal search should not have been included in the affidavit for a search warrant).  The court in *Wanless* noted that "[i]t is now fundamental that evidence which is obtained as a direct result of an illegal search and seizure may not be used to establish probable cause for a subsequent search."  882 F.2d at 1465 (citing *Vasey*, 834 F.2d 782; *United States v. Roberts*, 747 F.2d 537, 541 (9th Cir. 1984); *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)).  The court also rejected the government's suggestion that the good-faith exception should apply simply because the affidavit contained no misrepresentations.  The court again held that "[t]he mere fact that the officer requesting the warrant is truthful about the evidence he submits in support of the warrant is insufficient. . . . [T]he search pursuant to the warrant would be valid only if the legally obtained evidence, standing alone, was sufficient to establish probable cause."  *Wanless*, 882 F.2d at 1466-67.  Thus, consistent with the Second Circuit, the Ninth Circuit has held that if

suppression will alter the behavior of individual law enforcement officers or their departments, then the exclusionary rule must apply. This is the correct interpretation of *Leon* in conjunction with the fruit of the poisonous tree doctrine, and the panel erred by not reaching the same conclusion.

### iii.          *The Eleventh Circuit's Decision*

The Eleventh Circuit has reached the same conclusion as the Second and Ninth Circuits. In *United States v. McGough*, 412 F.3d 1232, 1239-40 (11th Cir. 2005), on similar facts to the case here, the Eleventh Circuit held that the good-faith exception does not apply. *McGough* too involved a warrantless entry into a defendant's home and the use of information obtained therein in an affidavit for a search warrant. The court held that "it was not an objectively reasonable law enforcement activity but rather the officers' unlawful entry into McGough's apartment that led to [the officer's] request for a search warrant. In such a situation, the search warrant affidavit was tainted with evidence obtained as a result of a prior, warrantless, presumptively unlawful entry into a personal dwelling." *Id.* (citing *Meixner*, 128 F. Supp. 2d 1070; *Reilly*, 76 F.3d 1271; *Wanless*, 882 F.2d 1459). Because of these facts — that is, "[b]ecause the officers were not permitted to enter McGough's apartment under these circumstances, without a warrant and without his consent," the Court found the exclusionary rule applicable. *Id.* at 1240. The good-faith exception was not applicable in such circumstances. *Id.*

The panel here erred by not adopting the rationale of these cases. Each of the cases discussed above acknowledged the difference between errors by magistrates and misconduct by police officers. Finding misconduct by the police officers in those cases — conduct that the exclusionary rule is meant to deter — the courts properly suppressed the evidence. These cases properly apply the exclusionary rule and the good-faith exception, in light of their respective goals, and accord a proper respect for the Fourth Amendment. The panel here, however, cited these cases, but neither adequately distinguished them or explored their reasoning. I explore additional decisions contrary to the panel's holding below.

### iv.          *Additional Authority Contrary to the Panel's Decision*

The Tenth Circuit has addressed this issue as well. In *United States v. Scales*, 903 F.2d 765, 768 (10th Cir. 1990), the court considered whether a prior illegal seizure could be used in a warrant to support a probable cause determination for the issuance of a search warrant. The court answered, as have the Second, Ninth, and Eleventh Circuits, as well as this Court in *Davis*, in the negative. Specifically and correctly, the court held that:

> The specific holding of *Leon* does not apply to the facts of this case, nor is the rationale behind it present here. When the DEA agents seized the suitcase and held it for more than twenty-four hours before obtaining a search warrant, they were not acting pursuant to a warrant subsequently deemed invalid. The "illegality" which arguably existed here was not a function of the agents' good faith reliance on a presumptively valid warrant. Moreover, the search of the suitcase after the search warrant was issued does not prevent us from evaluating the agents' behavior prior to that time.
>
> As the Ninth Circuit has observed, the "Supreme Court has applied the so-called 'good faith' exception to the exclusionary rule only to searches conducted in good faith reliance on a warrant or a statute later declared to be unconstitutional." We too decline to extend the holding of *Leon* to cases in which the good faith of the officer cannot be presumptively established by the existence of a search warrant valid on its face. Because the DEA agents were not acting in reliance on a search warrant when they seized the luggage and held it for more than twenty-four hours, *Leon* does not ratify their actions.

*Id.* at 768 (internal citations omitted).

The Seventh Circuit has likewise weighed in and held that "evidence discovered pursuant to a warrant will be inadmissible if the warrant was secured from a judicial officer through the use of illegally acquired information." *United States v. Oakley*, 944 F.2d 384, 386 (7th Cir. 1991) (citing *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 391-92 (1920) (Holmes, J.); *Wanless*, 882 F.2d at 1465).[7]

Several state courts have addressed the issue and determined that the good faith exception does not apply in these circumstances. I have found no state court decision agreeing with the panel here. The Supreme Court of Ohio has reached the same conclusion as the aforementioned federal courts of appeal. In *State v. Carter*, 630 N.E.2d 355 (Ohio 1994), the court addressed whether the good-faith exception could apply where the officers conducted an illegal search of the defendant's car and used the evidence seized in an affidavit to obtain a search warrant for the defendant's home. The court properly undertook an examination of the purposes of *Leon* and properly concluded that the rule is designed to deter *police* misconduct, rather than the errors of judges and magistrates. *Id.* at 362. In these circumstances and to effectuate the purpose of *Leon*, the court concluded that the "good faith exception does not apply where a search warrant is issued on the basis of evidence obtained as a result of an illegal search." *Id.* at 364 (citing *Vasey*, 834 F.2d 782; *Wanless*, 882 F.2d 1459; *Scales*, 903 F.2d 765). The Supreme Court of Ohio clearly understood the purpose of *Leon* and appreciated the distinctions that the panel here failed to. The court stated that "[i]t is important to note that the Supreme Court in *Leon* was willing to provide a good-faith exception to the exclusionary rule where the police officer heeds the command of the Fourth Amendment and seeks the approval of a detached magistrate before conducting a search. In *Leon*, the police officers had not violated the Fourth Amendment in attempting to acquire the needed probable cause necessary for the proper issuance of the search warrant." *Id.* at 364. In *Carter*, and all of the cases discussed *supra*, however, the officers *first* violated the Fourth Amendment and then used that illegally seized evidence to obtain a search warrant. In these circumstances, directly applicable to the panel's decisin here, suppression is the required remedy.[8] The Supreme Court of Ohio also recently re-affirmed *Carter*'s holding in *State v. Buzzard*, 839 N.E.2d 469 (Ohio 2005), holding that "where a search warrant is issued on the basis of evidence obtained as a result of an illegal search, the good-faith exception does not apply." *Id.* at 473-74 (citing *Carter*, 630 N.E.2d 355; *Vasey*, 834 F.2d 782; *Wanless*, 882 F.2d 1459; *Scales*, 903 F.2d 765).

The Arizona Supreme Court has also held that *Leon* is inapplicable in these circumstances. In *State v. DeWitt*, 910 P.2d 9, 14-15 (Ariz. 1996), the Court held that:

> Having already determined that the [officers]' warrantless entry and search were constitutionally impermissible, it follows that the search warrant, which relied on these very agents' observations to show probable cause, was invalid. The state cannot set up the good faith exception when, as here, the warrant upon which the

---

[7]The Seventh Circuit also correctly noted that the warrant is not necessarily entirely invalid. The courts must then review the warrant without the untainted evidence — that is, excluding poisoned fruit — to determine whether sufficient evidence exists to establish probable cause. *Oakley*, 944 F.2d at 386.

[8]Interestingly, the Supreme Court of Ohio also noted that "*Segura* and *Leon* were decided by the United States Supreme Court on the same day. Although *Leon* does not directly confront the issue of whether evidence should be suppressed when the only information in the affidavit for the search warrant that could have provided probable cause was illegally obtained, the decision in *Segura* implies that such an unpurged illegality irreparably taints the search warrant when evidence is illegally obtained, and thus the specific deterrence rationale upheld by *Leon* dictates that suppression be granted." *Carter*, 630 N.E.2d at 363.

police claim they relied in good faith was obtained as a direct result of their own unjustified warrantless entry.

*See also State v. Hicks*, 707 P.2d 331 (Ariz. Ct. App. 1985), *aff'd on other grounds sub nom. Arizona v. Hicks*, 480 U.S. 321 (1987). There, the Arizona court held that *Leon* "does not hold that a subsequent warrant validates an earlier illegal search. Police officers cannot launder their prior unconstitutional behavior by presenting the fruits of it to a magistrate." *Id.* at 333.

The Maryland Court of Special Appeals has held that "in the case of an antecedent Fourth Amendment violation which contributes to a warrant application, the 'fruit of the poisoned tree' doctrine 'trumps' the officer's 'good faith' reliance under *Leon*." *Fitzgerald v. State*, 837 A.2d 989, 1020 (Md. Ct. Spec. App. 2003). In *People v. Machupa*, 872 P.2d 114 (Cal. 1994), the California Supreme Court held that based upon *Leon*'s rationale, the good faith exception did not apply to a warrant issued after the police made an entry, without a warrant or consent, onto the defendant's premises and observed drugs in plain view. The Supreme Court of Idaho has also held that the good faith exception is inapplicable in these circumstances by focusing on the deterrence rationale and concluding that *Segura* trumps *Leon* in such circumstances. *State v. Johnson*, 716 P.2d 1288, 1298-1300 (Idaho 1986). The Louisiana Court of Appeal has concluded the same. *State v. Scull*, 639 So. 2d 1239, 1245 (La. Ct. App. 1994) (crediting deterrent purpose of exclusionary rule and holding that *Leon* does not save a warrant when the predicate search violates the Fourth Amendment).

Numerous federal district courts have also found that *Leon* is not applicable in these circumstances. *See United States v. McQuagge*, 787 F. Supp. 637, 657 (E.D. Tex. 1992) (holding that *Leon* "does not apply when, as in this case, the evidence necessary to support the magistrate's finding of probable cause is illegally obtained"), *aff'd sub nom. United States v. Mallory*, 8 F.3d 23 (5th Cir. 1993) (table); *United States v. Villard*, 678 F. Supp. 483, 490 (D.N.J. 1988) (holding that "*Leon* did not address the admissibility of evidence seized under a warrant that was based on information obtained in a prior illegal search. Further, it would be inappropriate and inconsistent with the reasoning of *Leon* to extend the good faith exception to such a situation."). In *United States v. Gray*, 302 F. Supp. 2d 646 (S.D. W.Va. 2004), the district court engaged in a lengthy and cogent analysis and also reached the same conclusion as the courts discussed above. *Gray*, like the case here, involved a prior warrantless and unconstitutional search of the defendant's home. The district court suppressed the evidence. Reviewing the deterrent purpose of *Leon*, the court distinguished the facts before it and noted that in the case before it, "the warrant was not invalid because the judge made an error in his assessment of probable cause. Instead, the warrant was invalid because the officers conducted an unlawful search of [the defendant's] home and submitted the tainted fruit of this unlawful search to the magistrate in the warrant application." *Id.* at 652. The court reasoned that *Leon* poses different factual circumstances — i.e., lawful, as opposed to unlawful, police conduct — and therefore courts should look to the purposes of the exclusionary rule and good-faith exception to determine the result of the particular case before it. *Id.* Looking to *Leon*, and its purpose of deterring unlawful police conduct, the court concluded, in line with the courts discussed above, "that the good faith exception is inapplicable to evidence obtained pursuant to a warrant invalidated on the basis of an illegal predicate search." *Id.* (citations omitted).

Discussing further, the court stated that "[u]nlike cases in which a warrant is invalidated due to a magistrate's error, invalidation resulting from an illegal predicate search involves *clear error* on the part of law enforcement, the recurrence of which will be significantly deterred by exclusion." *Id.* at 653 (emphasis added). The court also recognized that the illegal predicate search in the case before it was a warrantless search of the defendant's home — "a clear violation of the Fourth Amendment." *Id.*

The court went one step further and discussed whether an officer's truthfulness in an affidavit can cure the underlying constitutional violation. The Second Circuit in *Reilly* suppressed

the evidence for two reasons: (1) the officer's untruthfulness in the affidavit, and (2) the prior illegal search. *Reilly*, 76 F.3d at 1279-80. The Ninth Circuit has held that truthfulness in the affidavit does save the search. The district court here stated that:

> The issue of whether the officer informed the magistrate of the circumstances surrounding a predicate search is irrelevant to the application of the good faith exception. An officer who fails to tell a magistrate about the circumstances surrounding a predicate search is not necessarily acting in bad faith or trying to hide something because the warrant application process has never required an officer to explain with specificity how the evidence in the affidavit was obtained. Conversely, an officer cannot render a predicate search lawful simply by telling the magistrate the truth about the search. Regardless of whether an officer concealed or confessed the circumstances of the predicate search, he should bear responsibility for any illegality occurring prior to the issuance of the warrant. A magistrate's chambers is not a confessional in which an officer can expiate constitutional sin by admitting his actions in a well-drafted warrant application. The evidence remains tainted even if the officer admits its origins.

*Gray*, 302 F. Supp. 2d at 653. This reasoning is persuasive. Contrary to the panel's reasoning, I would reject the suggestion that the truthfulness of officers' affidavits can cure the underlying taint. I have discussed above the numerous persuasive authorities fundamentally contradicting and undermining the panel's conclusion here. Little more needs to be said on the great weight of authority. The panel's decision is simply not persuasive, nor does it even attempt to be, in light of the numerous conflicting decisions.

## IV.

### A.        *The Eighth Circuit's Decisions*

That leaves only the Eighth Circuit. Although I believe that the Eighth Circuit's decisions, upon which the panel relies, have been undermined — and also that the decisions are likewise not supported by *Leon* — I shall discuss the cases and then explain why they do not support the panel's ultimate conclusion. These decisions include *United States v. White*, 890 F.2d 1413 (8th Cir. 1989), *United States v. Kiser*, 948 F.2d 418 (8th Cir. 1991), and *United States v. Fletcher*, 91 F.3d 48 (8th Cir. 1996). The decision that undermines these cases is *United States v. O'Neal*, which I discuss *infra*.

*White*, *Kiser*, *Fletcher*, (and *O'Neal*) involved *Terry*-like stops at airports or bus terminals. In each of the cases, the police believed that they had reasonable suspicion that criminal activity was afoot and conducted *Terry* stops. In each case, it was subsequently determined by a reviewing court that the facts relied upon by the officers were insufficient to establish reasonable suspicion. Nevertheless, the Eighth Circuit held that the evidence obtained as a result of the *Terry* stop, which was used to obtain a warrant to search the defendants' luggage, was admissible pursuant to the good-faith exception.

In *Fletcher*, for example, the officers had some facts that they believed amount to reasonable suspicion to detain the defendant's luggage in order to execute a canine sniff of the luggage. *Fletcher*, 91 F.3d at 49. The dog then alerted and the officers used this information to obtain a warrant to search inside the bag. *Id.* The district court and Eighth Circuit held that the particular facts did not amount to reasonable suspicion — that is, there was not reasonable suspicion to conduct the canine sniff. Nevertheless, the court determined that the facts were "close enough" to reasonable suspicion that the evidence should not be suppressed. *Id.* at 52.

According to the *Fletcher* court, the "relevant inquiry is whether the facts surrounding reasonable suspicion are 'close enough to the line of validity' that the police officers were entitled to a belief in the validity of the warrant and the existence of reasonable suspicion. . . . If the case presents such a 'close' question, the *Leon* good faith exception to the exclusionary rule should be considered." *Id.* at 51 (citing *White*, 890 F.2d 1413). Without reviewing the purpose of the exclusionary rule or recognizing the distinction between police errors and a magistrate's error, per *Leon*'s instructions, the court stated that "[t]his case is indeed within the gray area of *Leon*." *Id.* (also noting that both *White* and *Kiser* were "so close to the line of validity as to warrant application of *Leon*"); *see also id.* at 52 ("While neither case supported a finding of reasonable suspicion, both were close to the line of validity."). These cases, addressing only erroneous *Terry* stops, fail to accord the purpose of the exclusionary rule its due respect.

### B.        *United States v. O'Neal*

Another Eighth Circuit case has undermined and limited the holdings in *White* and its progeny. In *United States v. O'Neal*, 17 F.3d 239 (8th Cir. 1994), the court again addressed a *Terry* stop that led to a warrant to search the defendant's bag. A reviewing court later determined that the detention of the bag was based on less than reasonable suspicion. Here, the court considered the purposes of *Leon*, and noted that "[n]either *White* nor *Leon*, however, are unqualified in their application." *Id.* at 242 n.6. Bringing its decisions closer in line with the courts reviewed above — though not entirely — the Eighth Circuit held that "[i]f the method by which evidence supporting a search warrant is seized is *clearly illegal*, then even under *Leon* . . . evidence obtained under the resulting warrant should be excluded." *Id.* (emphasis added). The court also noted that "[i]f clearly illegal police behavior can be sanitized by the issuance of a search warrant, then there will be no deterrence, and the protective aims of the exclusionary rule will be severely impaired, if not eliminated." *Id.*

### C.        *United States v. Conner*

At least one district court in the Eighth Circuit has applied the totality of the Eighth Circuit's jurisprudence in this area to a factual situation quite similar to *McClain*. In *United States v. Connor*, 948 F. Supp. 821 (N.D. Iowa 1996), the court addressed a situation where the police officers unlawfully accessed and entered the defendant's motel room (which, like a warrantless search of a home, is presumptively unconstitutional), and later used the evidence seized during the warrantless search in a search warrant application. *Id.* at 853.

The court noted that *White*, *Kiser*, and *Fletcher* all involved "*Terry*-like investigative stops at airports and bus terminals conducted without reasonable suspicion." *Id.* at 851. Thus, the court concluded that the "factual situation confronting the court is quite dissimilar from the circumstances presented in the *Fletcher-White* line of cases." *Id.* at 852. It was "significant" to the district court that the "*Fletcher-White* line of authority has never been extended beyond the factual scenario presented in each of those cases: *Terry*-type investigative stops conducted without reasonable suspicion." *Id.* at 853. In *Connor*, however, the court was confronted with a presumptively unconstitutional search of the defendant's hotel room "and the resulting inclusion in the search warrant application of information tainted by the unconstitutional entry." *Id.*

Nevertheless, the court found that even if the *Fletcher-White* line of cases could apply in all Fourth Amendment contexts (as opposed to being limited to the reasonable suspicion line of cases), the facts of *Connor* were not anywhere close to the line of validity as to warrant the application of the good-faith exception. *Id.* The Supreme Court's decision in *Payton* and hundreds of years of history prevent an officer from believing that a warrantless search of a dwelling is almost constitutional. *Id.* Thus, in applying *O'Neal*, the court found that the warrantless search of the motel room was "clearly illegal police behavior" and the good-faith exception did not apply. *Id.*

### D.        *Problems with the Eighth Circuit's and the Panel's Approach*

The great weight of authority, with which I agree, reaches the opposite conclusion from the Eighth Circuit. In my opinion, the Eighth Circuit's approach, which the panel apparently adopted — but erroneously applied — fails to properly apply the exclusionary rule and the good-faith exception. Whether to admit or exclude — the very core of *Leon*'s holding — comes down to whether suppressing the evidence will "alter the behavior of individual law enforcement officers or the policies of their departments." *Leon*, 468 U.S. at 918. When a reviewing court later determines that a magistrate erred, suppressing the evidence will serve no purpose because there is no unlawful police conduct to deter. *Id.* at 921 ("Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations."). But, when the misconduct is the police officer's own, the purpose of the exclusionary rule is served by suppression, and *Leon* does not apply. *Id.* at 918.

The Eighth Circuit's cases very clearly involved *police misconduct* and suppression of the evidence would deter officers from committing the same Fourth Amendment violations again.[9] The *Fletcher-White* line of cases do nothing to deter officers from conducting weakly supported *Terry* stops. In fact, the decisions have the opposite effect of encouraging officers to take chances to the detriment of Fourth Amendment privacy interests. The Eighth Circuit's decisions in this area also effectively lower the reasonable suspicion standard and have the effect of admitting evidence seized upon little more than an officer's good faith hunch. On the other hand, had the Eighth Circuit suppressed the evidence in line with the other courts discussed above, the effect would be to deter officers from conducting *Terry* stops unless the officers could "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the stops. *Terry v. Ohio*, 392 U.S. 1, 21 (1968).

Furthermore, even the *White-Fletcher* line of cases involves a violation of an individual's Fourth Amendment rights by police officers. Regardless of whether the officers had any bad faith, "[t]he deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused." *Peltier*, 422 U.S. at 539. The officers in the *White-Fletcher* line of cases, as well as in *McClain*, were, at the very least negligent, and suppressing the evidence serves the purposes of the exclusionary rule and does no harm to the good-faith exception.

For these reasons, I would not adopt the Eighth Circuit's precedent.

### V.

Even if I were to adopt the Eighth Circuit's position, however, — which contradicts the reasoning of nearly every other court to address the issue — a proper application of that position in this case *still* results in suppression of the evidence and the good-faith exception does not apply. A proper application of the Eighth Circuit's precedent was conducted by the district court in *Connor*, 948 F. Supp. 821. When the illegal predicate search was a search of the defendant's dwelling place

---

[9]Following *Kiser*, *O'Neal*, and *Fletcher* — where evidence was admitted despite police error, the result is that the police have little incentive to comply with the Fourth Amendment and contrarily, have an incentive to conduct *Terry* stops on weaker facts. Basically, from the police officer's perspective after *White*, as long as they are somewhere in the reasonable suspicion ballpark, the only reasonable thing to do (from a law enforcement perspective) is conduct a search. The worst thing that can happen is a later court says the officer did not have reasonable suspicion, but the evidence still gets in and the prosecution moves forward. If this set of incentives complies with *Mapp* and *Leon*, the deterrence rationale is eviscerated.

— a clearly illegal search — *O'Neal* requires suppression of the evidence and the good-faith exception does not apply. The panel, however, relegated *O'Neal* to a *but see* citation despite its being factually on all fours with *McClain*.

*O'Neal*, of course, held that "[i]f the method by which evidence supporting a search warrant is seized is clearly illegal, then even under *Leon* . . . evidence obtained under the resulting warrant should be excluded." 17 F.3d at 242 n.6. There can be no doubt at all that a warrantless search of a person's home is "clearly illegal" based on any interpretation of the Fourth Amendment. *See Payton*, 445 U.S. at 586; *United States v. United States District Court*, 407 U.S. 297, 313 (1972) ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."); *Coolidge v. New Hampshire*, 403 U.S. 443, 474-75 (1971) ("[A] search carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show that it falls within one of the carefully defined set of exceptions based on the presence of 'exigent circumstances.'").

The panel acknowledges as much. But then, the panel cites *White* to the effect that the illegal predicate search was "close enough to the line of validity," *White*, 890 F.2d at 1419, and then incomprehensibly somehow concludes that the "[t]he same is true here." *McClain*, 430 F.3d at 308. To reach this fantastic conclusion, it must resort to internally inconsistent logic and the subjective beliefs of the officers. First, it is illogical to acknowledge that the search here was *presumptively unconstitutional*, but also "close enough" to be legal. When a search is presumptively unconstitutional, the burden is placed upon the *government* to demonstrate an exception to the rule to bring the search within the Fourth Amendment. *See Coolidge*, 403 U.S. at 474. The panel explicitly acknowledges these legal standards and then correctly rejected the government's justifications for the initial search. *McClain*, 430 F.3d at 304-06. Nevertheless, the panel then somehow concludes that this same *presumptively unconstitutional* search, a search described as the "chief evil" against which the Fourth Amendment was adopted, was somehow "close enough" to legal such that the good-faith exception would apply. How a search goes from presumptively unconstitutional to close enough is not clear to me and I believe the panel is in error.

What is even more indefensible about the panel's conclusion that the prior warrantless search of the home was "close enough to the line of validity" is that it must resort to the officer's *subjective* beliefs to reach such a conclusion. No one can reasonably argue that any officer wouldn't know that a warrantless search of a person's home is presumptively unconstitutional. The panel certainly does not dispute this and in fact, undermines its own conclusion. In reviewing the legality of the search of McClain's residence, the panel notes that "the officers' own testimony at the suppression hearing reveals that they had no *objective* basis for their concern that a burglary was being committed at McClain's residence." *McClain*, 430 F.3d at 306 (emphasis added). Thus, the panel explicitly concedes that there was no objective basis for the officers to believe that their warrantless search of the home was lawful. Nevertheless, the majority justifies the search by stating that it found "no evidence that the officers *knew* they were violating the Fourth Amendment." *Id.* at 308 (emphasis added). The officers' subjective beliefs, however, are simply irrelevant and relying upon them to justify a search is wrong. "If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police." *Beck v. Ohio*, 379 U.S. 89, 97 (1964). That there is no evidence of bad faith or intentional violation of the Fourth Amendment is irrelevant to the outcome of this case. The panel's reliance on the officers' subjective beliefs is a grave and fundamental error. It is also logically inconsistent to conclude that the search was objectively unreasonable yet "close enough to the line of validity" to be constitutional.

Finally, the panel cites *Thomas*, from the Second Circuit, and claims that "[t]here was indeed nothing more that Officer Murphy 'could have or should have done under these circumstances to be sure his search would be legal.'" *McClain*, 430 F.3d at 308 (quoting *Thomas*, 757 F.2d at 1368).

This both misinterprets the Second Circuit's analysis and is also incorrect. The focus of the Second Circuit's inquiry — on what more could have been done — is on the officer who conducts the *first* illegal search. In *McClain*, the first officers could have done plenty to make sure that their search was legal. *See McClain*, 430 F.3d at 310 (Boggs, J., concurring in the judgment) (noting that "the officer[s] could have taken other action. . . . [H]e could have tried, but did not, to determine who owned the house and attempt to contact him about the supposed intruder. He could have set up a barricade around the house and waited for any intruder to leave. Or he could simply have waited until he had located a judge who would sign a search warrant"). Likewise, even if the panel wishes to focus on the officer who ultimately requested the warrant, there is plenty more he could have done to bring the search within the Fourth Amendment. First and foremost, he could have avoided using evidence gained as a result of the earlier officers' presumptively unconstitutional search of the home in his affidavit for the search warrant. He could have investigated sufficiently and obtained evidence that was either from an independent source or attenuated, which would have established probable cause. A distortion of *Thomas* does not support the panel's conclusion. Although I believe that the Eighth Circuit's approach is in error, and would adopt the reasoning of the Second, Seventh, Ninth, Tenth, and Eleventh Circuits, numerous district and state courts, as well as this Court's decision in *Davis*, even applying the Eighth Circuit's approach leads to suppression of the evidence in this case.

## VI.

For all of the reasons discussed, I believe that the panel's decision is seriously in error. I would suppress the evidence seized — i.e., the officer's visual observations — during the predicate illegal search. The proper remedy is to delete this evidence from the warrant application. In this case, however, the district court already determined that all of the additional evidence in the warrant was derivative of the illegal search and thus, poisonous fruit.[10] Severing the police officers' illegal search of the home from the subsequent surveillance and applying the good-faith exception to the subsequent surveillance is also an unacceptable outcome. To apply the good-faith exception to fruits of an illegal search — in essence, because following the initial illegality, the officers decided to play nice — would have the good-faith exception swallow the fruit of the poisonous tree doctrine. Fruits of initial illegal conduct are essentially always gathered in good faith. Likewise, as the panel did, attempting to apply the good-faith exception to the fruits by determining, perhaps on some magical sliding scale, whether the predicate illegal search was a little bit illegal (i.e., "close enough to the line of validity"), a middle amount illegal, or really illegal — even assuming it can be said that there are varying degrees of Fourth Amendment violations — strikes me as an unprincipled method of adjudication, and one that is not within the judicial competence. All the fruits, therefore, must be suppressed. Accordingly, I would affirm the district court's judgment suppressing the evidence.

---

[10]The district court found no indication that any of the evidence came from an independent source, *see Silverthorne Lumber Co.*, 251 U.S. at 392, or that the unlawful search became "so attenuated as to dissipate the taint," *Nardone*, 308 U.S. at 341, or that the evidence "would inevitably have been discovered," *Nix v. Williams*, 467 U.S. 431, 444 (1984). Thus, none of these exceptions would save the other evidence included in the search warrant application, and all of the evidence must be suppressed.

The cost to society of suppressing evidence is not an easy one to stomach. I like it no more than anyone. It would be particularly difficult to accept in this case, where several drug dealers would walk free. But, in our constitutional structure, it is a cost that society must bear. The corresponding benefit is a respect for our Fourth Amendment rights and the deterrent effect suppression would have upon police officers' misconduct. This is the balance that has been struck. We ought to enforce it. I dissent from the Court's decision not to rehear this case to correct the panel's fundamental Fourth Amendment error.

ENTERED BY ORDER OF THE COURT


/s/ Leonard Green
_____
Clerk

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

No. 04-5887

KEVIN MCCLAIN; GEORGE BRANDT, III; JASON
DAVIS,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 02-00126—William J. Haynes, Jr., District Judge.

Argued: July 20, 2005

Decided and Filed: December 2, 2005

Before: BOGGS, Chief Judge; BATCHELDER and GIBBONS, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Thomas M. Gannon, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Richard L. Gaines, ELDRIDGE & GAINES, Knoxville, Tennessee, Peter J. Strianse, TUNE, ENTREKIN & WHITE, Nashville, Tennessee, for Appellees. **ON BRIEF:** Thomas M. Gannon, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Richard L. Gaines, ELDRIDGE & GAINES, Knoxville, Tennessee, Peter J. Strianse, TUNE, ENTREKIN & WHITE, Nashville, Tennessee, R. Price Nimmo, NIMMO, HOEHN & NIMMO, Nashville, Tennessee, for Appellees.

BATCHELDER, J., delivered the opinion of the court, in which GIBBONS, J., joined. BOGGS, C. J. (pp. 8-10), delivered a separate opinion concurring in the judgment.

———————————

## OPINION

———————————

ALICE M. BATCHELDER, Circuit Judge. On July 25, 2002, a federal grand jury returned an indictment charging Defendants-Appellees Kevin McClain, George Brandt III, and Jason Davis with conspiracy and substantive marijuana trafficking in violation of 21 U.S.C. §§ 841(a)(1) and 846. The defendants moved to suppress all evidence obtained during and as a consequence of a warrantless search of McClain's residence on October 12, 2001, including evidence seized during execution of search warrants issued on the basis of evidence obtained as a result of that initial

1

warrantless search.  The district court granted the motions, holding that the warrantless search of McClain's residence was not justified by exigent circumstances, the good faith exception to the exclusionary rule did not apply to these circumstances, and the derivative evidence must be suppressed.  Although we agree with the district court's conclusion that there was neither probable cause nor exigency to justify the warrantless search of McClain's residence, we find that, under the particular facts of this case, the good faith exception to the exclusionary rule applies.  We will therefore reverse the judgment granting the motions to suppress.

## I.  FACTUAL AND PROCEDURAL HISTORY

At around 9:30 p.m. on October 12, 2001, the dispatch operator for the Hendersonville, Tennessee Police Department received a phone call from a concerned neighbor who reported seeing a light on in a house located at 123 Imperial Point, which had been vacant for several weeks.  The police dispatcher contacted Officer Michael Germany and notified him of a possible "suspicious incident" at that address.  Upon arriving near the scene a couple minutes later, Officer Germany parked his police cruiser about 100 yards away and took up a position behind a tree across the street from the residence.  From that vantage point, Officer Germany watched the house for a few moments and confirmed that lights were on in a bedroom on the west side of the house and in the dining area in the center of the house.

Moving to a position behind a tree closer to the house, Officer Germany watched the house for several more minutes but observed no movement either inside or outside the house.  He then performed a complete inspection of the outside of the house and found no open or unlocked windows, doors or gates, and no sign of forced entry or illegal activity, until he reached the front of the house.  There, he found that the front door was slightly ajar; that is, the wooden door was touching the door frame, but the door was not fully secured, the dead bolt lock was visible, and he could see a sliver of light showing through the crack, which he estimated to be less than an inch wide.

Although Officer Germany had seen no movement in or around the house, or any signs of forced entry or vandalism, or any kind of criminal activity, he was nevertheless concerned that the open door and the lights might be signs that a burglary was in progress or that juveniles had entered the house to vandalize or engage in underage drinking.  He therefore sent out a general call for back-up, and within a few minutes, Officer Jason Williams arrived at the house.  Officer Germany suggested that they "clear" the house because the open door could indicate a crime in progress, and the officers walked up to the front porch and pushed the wooden door the rest of the way open.  Officer Germany announced their presence loud enough so that anyone inside could hear him, and after waiting for "approximately two to five minutes" and receiving no response from inside the house, they entered with their guns drawn.  Moving from room to room in order to clear it of any potential perpetrators, the officers found no furniture in the house except a television set on the living room floor.  They found fast food wrappers on the kitchen counter and a piece of luggage and a child's toy in one of the bedrooms in the house.  After securing the upstairs rooms, the officers moved to the basement where they observed that the windows were covered with inward-facing reflective paper and that a large room contained a substantial amount of electrical wiring connected to a junction box and what appeared to be plant stimulators.  The basement also contained a number of boxes marked as grow lights.  While  neither officer saw any marijuana in the house or observed any illegal activity, both concluded that a marijuana grow operation was being set up in the basement of the house.  Following their search of the basement, the officers cleared the garage and, finding nothing, left the premises.

That same night, Officer Germany's supervisor contacted Officer Brian Murphy of the Sumner County Drug Task Force concerning the search at 123 Imperial Point.  Officer Murphy determined that the home was owned by Kevin and Tina McClain.  The next day, after receiving

Officer Germany's report on the search of 123 Imperial Point, Officer Murphy began investigating a possible marijuana grow operation at the home. He placed the property under off-and-on surveillance for several weeks and eventually determined that McClain, Brandt and Davis were engaged in setting up a marijuana grow operation at 123 Imperial Point and at several other residences.

On November 27, 2001, Officer Murphy obtained warrants to search the house at 123 Imperial Point and five other properties that he had linked to the defendants through his investigation and surveillance. The warrant affidavit explicitly relied in part on evidence obtained during the initial warrantless search of 123 Imperial Point conducted on October 12 and described the circumstances of that search. When law enforcement authorities executed the warrants on November 28, 2001, they recovered from 123 Imperial Point 348 marijuana plants and various types of plant growing equipment. The searches of the other five properties for which Officer Murphy had obtained warrants also uncovered numerous marijuana plants and plant-growing paraphernalia.

Based on information obtained during these searches, as well as post-arrest statements made to the police by Brandt and Davis, a federal grand jury returned a three-count indictment charging McClain, Brandt, and Davis with conspiring to manufacture and to possess with intent to distribute more than 1,000 marijuana plants in violation of 21 U.S.C. § 846; manufacturing and possessing with intent to distribute 1,000 or more marijuana plants in violation of 21 U.S.C. § 841(a)(1); and possessing with intent to distribute less than 50 kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1). McClain moved to suppress the evidence found during the searches on October 12 and November 28 of his home located at 123 Imperial Point. Brandt and Davis moved to suppress evidence obtained during the searches, as well as their post-arrest statements. After an evidentiary hearing, the district court granted each defendant's motion to suppress.[1] The court found that the warrantless entry and search of 123 Imperial Point violated the Fourth Amendment, necessitating the suppression of all evidence derivative of that warrantless search, and that the good faith exception to the exclusionary rule established in *United States v. Leon*, 468 U.S. 897 (1984), did not apply. The United States filed a timely notice of appeal.

## II. DISCUSSION

### A. STANDARD OF REVIEW

The government contends on appeal that the district court erred in granting the defendants' motions to suppress. In reviewing a district court's decision regarding a motion to suppress evidence, we review all factual findings for clear error and all legal conclusions *de novo*. *United States v. Yoon*, 398 F.3d 802, 805 (6th Cir. 2005). In particular, we review *de novo* the district court's determinations that no exigency existed to justify the Hendersonville police officers' warrantless entry into McClain's home, that all subsequently seized evidence constituted the fruit of the initial illegal search, and that the good faith exception to the exclusionary rule does not apply to this evidence. *See United States v. Rohrig*, 98 F.3d 1506, 1511 (6th Cir. 1996).

---

[1] The United States argued before the district court that Brandt and Davis did not have standing to challenge the search of 123 Imperial Point. The district court concluded that McClain had standing because 123 Imperial Point was his home and was not abandoned, found that Brandt had standing, and did not discuss Davis. The court then immediately went on to discuss the suppression issues, leaving the standing issue partially unresolved. Although the record provides no basis on which this court could find Davis had standing to contest the search, the United States did not raise the issue of standing before this court. We therefore have no occasion to discuss the matter.

**B. LEGALITY OF THE WARRANTLESS SEARCH**

We first address the legality of the warrantless search of McClain's residence. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. CONST. amend. IV. Because the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," *United States v. United States District Court*, 407 U.S. 297, 313 (1972), "a search carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.'" *Coolidge v. New Hampshire*, 403 U.S. 443, 474-75 (1971). More precisely, the police may not enter a private residence without a warrant unless both "probable cause plus exigent circumstances" exist. *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) (per curiam); *United States v. Chambers*, 395 F.3d 563, 572 (6th Cir. 2005). There is no dispute that the warrantless search of McClain's home on October 12, was "presumptively unreasonable" under the Fourth Amendment. *Payton v. New York*, 445 U.S. 573, 586 (1980). The government, however, contends that probable cause and exigent circumstances justified the warrantless search.

In general, exigent circumstances exist when "real immediate and serious consequences" would certainly occur if a police officer were to "postpone[ ] action to get a warrant." *Welsh v. Wisconsin*, 466 U.S. 740, 751 (1984) (internal quotation omitted). "The exigent circumstances exception relies on the premise that the existence of an emergency situation, demanding urgent police action, may excuse the failure to procure a search warrant." *United States v. Radka*, 904 F.2d 357, 361 (6th Cir. 1990). We have identified the emergency situations giving rise to the exigent circumstances exception to the warrant requirement as (1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, or (4) a risk of danger to the police or others. *United States v. Williams*, 354 F.3d 497, 503 (6th Cir. 2003) (citing *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994)). Because warrantless searches are presumptively unreasonable under the Fourth Amendment, the government bears a "heavy burden" of proving exigency. *Welsh*, 466 U.S. at 749-50.

In attempting to satisfy its burden, the government primarily relies on the established precedent in this circuit that the police may "enter a residence without a warrant if there is probable cause to believe that there is a burglary in progress." *United States v. Reed*, 141 F.3d 644, 649 (6th Cir. 1998) (citing *United States v. Johnson*, 9 F.3d 506, 509-10 (6th Cir. 1993)). Because both probable cause and exigency must be present for the police to make a warrantless entry and search of a home, we emphasized in *Johnson* that when the police have probable cause to believe that a burglary is in progress, they are also confronted with the necessary exigency, that is, the need "to ensure the protection of everyone on the scene and to prevent the loss or destruction of the owner's property." *Johnson*, 9 F.3d at 510. The government further relies on our statement in *Rohrig* that "we are not precluded from fashioning a new exigency" that would justify the warrantless entry into a citizen's home. *Rohrig*, 98 F.3d at 1519; *see also United States v. Plavcak*, 411 F.3d 655, 663 (6th Cir. 2005). But neither *Johnson* nor *Rohrig* helps the government here because the government's argument is premised on its claim that the officers had probable cause to believe a burglary was in progress at 123 Imperial Point. As we explain below, the undisputed facts in this case demonstrate that the police did not have probable cause to believe that a burglary was in progress; hence there was no exigency as a consequence of the possible burglary such that *Johnson* would support the warrantless entry. And because the government's premise has always been that the exigency was created by probable cause to believe there was a burglary in progress, we have no occasion to consider whether, as *Rohrig* might permit, we should fashion a new exigency in this case.

"Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (en banc) (internal quotation omitted). Under this "flexible, common-sense standard," *Texas*

*v. Brown*, 460 U.S. 730, 742 (1983), the establishment of probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). However, the "mere possibility" that a crime could be occurring within a home is not sufficient to justify a warrantless search; the police must have an "objectively reasonable basis for their belief" that a crime is being committed. *United States v. Ukomadu*, 236 F.3d 333, 337 (6th Cir. 2001). Likewise, mere speculation that a crime could be occurring is insufficient to establish probable cause. *See McCurdy v. Montgomery County, Ohio*, 240 F.3d 512, 519 (6th Cir. 2001).

In our view, a neighbor's phone call indicating that the owners had moved out of the house at 123 Imperial Point several weeks earlier and that there was a light on in the house that had not been on before, even coupled with the officers' discovery of a slightly ajar front door, does not present the type of objective facts necessary to establish probable cause that a burglary was in progress at the house. Under similar circumstances, our precedent has required more—namely, the existence outside the searched premises of some physical signs of a burglary or some direct evidence of a home invasion. *Johnson*, 9 F.3d at 509-10 (holding that probable cause and exigent circumstances justified a warrantless search when officers responded to a burglary in progress after a neighbor reported seeing individuals crawl through a window of a residence, and upon arriving on the scene, the officers observed a broken window and two individuals inside); *United States v. Estese*, 479 F.2d 1273, 1274 (6th Cir. 1973) (holding that exigent circumstances justified a warrantless search after the police responded to a radio call and discovered that the door to an apartment had been pried open). We agree with the district court that the facts of this case are more analogous to the facts of *United States v. Selberg*, 630 F.2d 1292 (8th Cir. 1980), in which the Eighth Circuit held that a neighbor's contacting the police to report that the front door of a nearby home was open, in the absence of any other signs of a burglary or suspicious activity, did not justify the warrantless entry into the home. *Id.* at 1293-94, 1296.

We understand that these officers were responding to a "suspicious incident" call and, and we find no evidence that they acted in bad faith when, after finding the front door to McClain's home slightly ajar, they went inside to ensure that no criminal activity was afoot. Sometimes the line between good police work and a constitutional violation is fine indeed. Here, however, the officers' own testimony at the suppression hearing reveals that they had no objective basis for their concern that a burglary was being committed at McClain's residence. Both officers testified that there was no emergency necessitating their entry into the home. Officer Germany testified that upon inspecting the exterior of the house, he observed no movement in or around the home, no signs of forced entry or vandalism, and no suspicious noises or odors emanating from the house. Officer Williams similarly testified that upon his arrival he observed no signs of any criminal activity. Officer Williams even stated that the officers' hunch that a burglary could be occurring inside the residence was mere "speculation." Speculation does not equate to probable cause. *See Ferguson*, 8 F.3d at 392 (defining probable cause as "reasonable grounds for belief, supported by less than prima facie proof *but more than a mere suspicion*") (emphasis added). Indeed, mere speculation that a crime could be occurring, without more, simply does not suffice to overcome the presumption of unconstitutionality attached to a warrantless intrusion into the sanctity of the home.

Because the government must demonstrate both probable cause and exigent circumstances to justify the warrantless entry, we need not reach the issue of exigent circumstances. We would simply note that both officers explicitly testified that there was no emergency necessitating their entry into McClain's home. The *sine qua non* of the exigent circumstances analysis is the existence of an "emergency situation." *Radka*, 904 F.2d at 361. "Where, as here, officers are not responding to an emergency there must be *compelling reasons* to justify the absence of a search warrant." *McDonald v. United States*, 335 U.S. 451, 454 (1948) (emphasis added). Such compelling reasons cannot be established under the facts of this case where officers who were not faced with an

emergency situation, however good their intentions, had only an unparticularized hunch that a crime was being committed inside McClain's home.

Because neither probable cause nor exigent circumstances justified the officers' warrantless entry and search of McClain's home on October 12, 2001, we find no error in the district court's conclusion that the entry and search were in violation of the Fourth Amendment.

## C.  VALIDITY OF THE WARRANT SEARCHES AND THE GOOD FAITH EXCEPTION

Our analysis does not end here, however.  Under the unique circumstances presented by this case, we are called upon to address an issue of first impression in this circuit—namely, we must reconcile the "good faith" exception established in *Leon*, 468 U.S. at 919, with the "fruit of the poisonous tree" doctrine first coined in *Nardone v. United States*, 308 U.S. 338, 341 (1939).  The essence of that doctrine is that evidence unlawfully obtained, including all derivative evidence flowing from it, should be suppressed.  *See Segura v. United States*, 468 U.S. 796, 804 (1984).  The exclusionary rule would therefore work to exclude all evidence obtained subsequent to and as a consequence of an illegal search because, as the fruit of a prior illegality, such evidence is tainted unless (1) the government learns of the evidence from an "independent source," *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920); (2) the connection with the unlawful search becomes "so attenuated as to dissipate the taint," *Nardone*, 308 U.S. at 341; or (3) the evidence "would inevitably have been discovered." *Nix v. Williams*, 467 U.S. 431, 444 (1984).  We find that none of these three exceptions to the exclusionary rule applies here.

In *Leon*, the Supreme Court announced another exception to the exclusionary rule, holding that the rule should not apply to evidence obtained by an officer who conducts a search in reasonable reliance on a search warrant that was issued by a neutral and detached magistrate, but is ultimately found to be unsupported by probable cause or otherwise defective.  *Leon*, 468 U.S. at 920-22.  In general, suppression of evidence obtained pursuant to a search warrant later found to be defective "should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Id.* at 918.  In particular, the *Leon* court explained, suppression is appropriate if (1) the magistrate was "misled by information in the affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;" (2) the magistrate "abandoned his judicial role" or neutrality; (3) the warrant was "so lacking in indicia of probable cause" as to render official belief in its existence unreasonable; or (4) the warrant was so "facially deficient" that it could not reasonably be presumed valid.  *Id*. at 923.  We agree with the government that none of these factors is present in this case.

The wrinkle in the case before us today is that the warrants on which the officers relied—reasonably, we think—to search 123 Imperial Point a second time and to search the five other properties were themselves the fruit of the poisonous tree.  The question therefore becomes whether the good faith exception to the exclusionary rule can apply in a situation in which the affidavit supporting the search warrant is tainted by evidence obtained in violation of the Fourth Amendment.  The Ninth and Eleventh Circuits have answered that question in the negative. *United States v. McGough*, 412 F.3d 1232, 1239-40 (11th Cir. 2005) (holding that the good faith exception does not apply where a search warrant is issued on the basis of evidence obtained as the result of an illegal search); *United States v. Wanless*, 882 F.2d 1459, 1466-67 (9th Cir. 1989) (same); *United States v. Vasey*, 834 F.2d 782, 789 (9th Cir. 1987) (holding that a "magistrate's consideration of the evidence does not sanitize the taint of the illegal warrantless search").  On the other hand, the Second and Eighth Circuits have held that, at least under some circumstances, the *Leon* good faith exception can still apply when the warrant affidavit relies on evidence obtained in violation of the Fourth Amendment.

In *United States v. Fletcher*, 91 F.3d 48, 51-52 (8th Cir. 1996), the Eighth Circuit held that the *Leon* exception was applicable to the warrant-authorized search of a bag, even though the officers' initial detention of the bag in order to subject it to a dog sniff violated the Fourth Amendment. The court explained that the the circumstances surrounding both the initial detention of the bag and the subsequent issuance of the warrant were "sufficiently close to the line of validity" that the officers had "an objectively reasonable belief that they possessed a reasonable suspicion such as would support the valid detention of [the] bag as well as an objectively reasonable belief that the warrant issued was valid." *Id.* at 52. *See also United States v. Kiser*, 948 F.2d 418, 421-22 (8th Cir. 1991) (same); *United States v. White*, 890 F.2d 1413, 1419 (8th Cir. 1989) (same); *United States v. Thomas*, 757 F.2d 1359, 1368 (2d Cir. 1985) (holding *Leon* applicable to the subsequent warrant-authorized search of an apartment, even though the affidavit contained evidence obtained in violation of the Fourth Amendment, because the officer, who was acting in good faith, disclosed all information to the magistrate and had no reason to believe that his actions were unconstitutional); *but see United States v. Reilly*, 76 F.3d 1271, 1281-82 (2d Cir. 1996) (holding *Leon* inapplicable where officers seeking warrant acted in clear bad faith by failing to disclose to the magistrate in their warrant affidavit the circumstances surrounding a dubious pre-warrant search); *United States v. O'Neal*, 17 F.3d 239, 243 n.6 (8th Cir. 1994) (holding that a magistrate's issuance of a search warrant could not sanitize prior illegal conduct when the method by which evidence supporting the search warrant was seized was "clearly illegal").

We conclude that this is one of those unique cases in which the *Leon* good faith exception should apply despite an earlier Fourth Amendment violation. We find *White*'s statement of the rule in *Leon* particularly instructive: "evidence seized pursuant to a warrant, even if in fact obtained in violation of the Fourth Amendment, is not subject to the exclusionary rule if an objectively reasonable officer could have believed the seizure valid." *White*, 890 F.2d at 1419. The court in *White* refused to apply the exclusionary rule because the facts surrounding the initial Fourth Amendment violation were "close enough to the line of validity to make the officer's belief in the validity of the warrant objectively reasonable." *Id.* The same is true here. The facts surrounding these officers' warrantless entry into the house at 123 Imperial Point were not sufficient to establish probable cause to believe a burglary was in progress, but we do not believe that the officers were objectively unreasonable in suspecting that criminal activity was occurring inside McClain's home, and we find no evidence that the officers knew they were violating the Fourth Amendment by performing a protective sweep of the home. More importantly, the officers who sought and executed the search warrants were not the same officers who performed the initial warrantless search, and Officer Murphy's warrant affidavit fully disclosed to a neutral and detached magistrate the circumstances surrounding the initial warrantless search. On the basis of that affidavit, the magistrate issued the search warrants. There was indeed nothing more that Officer Murphy "could have or should have done under these circumstances to be sure his search would be legal." *Thomas*, 757 F.2d at 1368. Because the officers who sought and executed the search warrants acted with good faith, and because the facts surrounding the initial warrantless search were close enough to the line of validity to make the executing officers' belief in the validity of the search warrants objectively reasonable, we conclude that despite the initial Fourth Amendment violation, the *Leon* exception bars application of the exclusionary rule in this case. *See Leon*, 468 U.S. at 920 (explaining that the exclusion of evidence will not further the purposes of the exclusionary rule "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope").

## III. CONCLUSION

For the foregoing reasons, we **REVERSE** the judgment of the district court and we **REMAND** this case for further proceedings consistent with this opinion.

---

**CONCURRING IN THE JUDGMENT**

---

BOGGS, Chief Judge, concurring in the judgment. Although I concur with the majority's decision to reverse the judgment of district court, I write separately because, respectfully, I do not agree that the initial search of 123 Imperial Point was unreasonable.

To overcome the presumption that a warrantless search of a private residence is presumptively unreasonable, the police must demonstrate probable cause and, in this instance, exigent circumstances. In this circuit, only four situations clearly give rise to exigent circumstances: (1) hot pursuit of a fleeing suspect; (2) imminent destruction of evidence; (3) need to prevent a suspect's escape; and (4) danger to the police or to the public. *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994); *see also United States v. Haddix*, 239 F.3d 766, 767 (6th Cir. 2001). However, following the lead of other circuits, this circuit has also upheld warrantless searches conducted during suspected burglary investigations under the exigent circumstances exception. *United States v. Johnson*, 9 F.3d 506, 509 (6th Cir. 1993); *United States v. Estese*, 479 F.2d 1273, 1274 (6th Cir. 1973). In addition, the court has opined that:

> these existing categories do not occupy the entire field of situations in which a warrantless entry may be justified. As an initial matter, the Fourth Amendment's broad language of "reasonableness" is flatly at odds with any claim of a fixed and immutable list of established exigencies. Moreover, such a claim would ignore the case-by-case and fact-specific development of the existing categories of exigent circumstances. None of the presently recognized exigencies can claim any special constitutional status; instead, each was a product . . . of a particular case in light of underlying Fourth Amendment principles. . . . Therefore, if the situation dictates, we are not precluded from fashioning a new exigency that justifies the warrantless entry into Defendant's home.

*United States v. Rohrig*, 98 F.3d 1506, 1519 (6th Cir. 1996). The court assesses the police officers' belief in the existence of an exigent circumstance based upon the "objective facts reasonably known to, or discoverable by, the officers at the time of the search." *United States v. Tibolt*, 72 F.3d 965, 969 (1st Cir. 1995). *See also Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990). But this is a relatively forgiving standard, as the Supreme Court explained:

> "Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability."

*Ibid.* (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

Upon approaching 123 Imperial Point, Officer Germany knew that the house had reportedly been vacant for some time and that a neighbor had called and reported a light on inside. Checking the doors and windows, Officer Germany saw and heard nothing amiss until he reached the front door, which he found ajar. The fact that the officer neither saw signs of forced entry nor heard any noises does not mean there were no possible crimes being committed inside. The house was two stories; the officer testified that a light was on upstairs. Obviously, he could not see into the second floor windows. The house was also not small. It had several bedrooms and a basement. It certainly would be possible for an intruder to have been inside the house, even talking or vandalizing the place, without noise being audible from outside. Therefore, all the officer knew was that a house,

reported by a named neighbor to have been vacant for some time, had lights on, no car visible suggesting the owner had returned, and that the front door was ajar, with no porch lights on. Even if the officer could see no signs that the door had been forced, the door could have been left unlocked, the lock could have been picked, or the keys stolen.

The officer had to use his best professional judgment. Admittedly, as Appellees suggest, the officer could have taken other action. Even though it was a Friday night, he could have tried, but did not, to determine who owned the house and attempt to contact him about the supposed intruder. He could have set up a barricade around the house and waited for any intruder to leave. Or he could simply have waited until he had located a judge who would sign a search warrant. While any of these courses of action might have been possible, a "court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed . . . years after the fact." *Hunter v. Bryant*, 502 U.S. 224, 228 (1991). I believe that Officer Germany did act reasonably.

The cases Appellees cite, to argue that this situation could not reasonably lead an officer to believe there was an exigent circumstance, simply do not compare with the case at bar. In *United States v. Selberg*, 630 F.2d 1292 (8th Cir. 1980), the door to the trailer had been open when Selberg left the day before. The trailer was not vacant, and all the officer needed to do to satisfy himself that nothing was amiss was look inside. He did not need to enter to see that no burglary had occurred. In *United States v. Morgan*, 743 F.2d 1158 (6th Cir. 1984), the police waited hours before raiding Morgan's house and did so based solely on the warning of an anonymous person that Morgan was armed. Finally, in *United States v. Williams*, 354 F.3d 497 (6th Cir. 2003), the DEA officer entered the house without a warrant, even though the testimony of the landlord concerning her suspicions of a marijuana growing operation would have been sufficient to get a warrant and despite the fact that nothing she told them suggested there was any immediate danger.

In none of these cases was an officer confronted with a situation in which he had limited information, all of which suggested the possibility of a crime in progress, and based on which he had to make an immediate decision about how to act. In such an ambiguous situation, the court can only ask that the police act "sensibly," as a reasonable man making reasonable assessments of probability would act under the same circumstances. *Rodriguez*, 497 U.S. at 186.

In order to make a search reasonable, there must be a balance of the intrusiveness of the search against the exigency of the circumstance. Both are merely estimates of probability, and must be taken together. In this case, the balance of all the information available to the officers was that the house was indeed abandoned, and was not an active residence of a legitimate occupant. Nothing that they saw through the windows or, indeed, once they entered the house (fast food wrappers, one suitcase and a television, and potential contraband in an empty house) negated this perception. This is quite different from the *Selberg* case, where all the evidence available indicated a legitimate occupant who was merely temporarily absent. On the other hand the exigency, even were I to agree with the court's opinion that it did not amount to probable cause (but see page 10, *infra*) amounted to a very plausible belief that there was a good chance that criminal activity, perhaps even violent activity, was afoot.

As I attempt to assess the reasonableness of the officers' actions in entering the house (as opposed to simply allowing whatever was going on within the house to continue, perhaps for many hours until the hypothesized alternate courses could develop) the fact that this was a situation where a common sense assessment would be that a legitimate owner, could that person have been contacted, would want the officers to investigate the possible break in, tips me in the direction of finding the actions reasonable.

In addition, the various comments in the majority's opinion (at pages 5-6) that the officers conceded that there was no emergency may represent a somewhat overenthusiastic reading of the transcript. The supporting testimony comes from the officers, at best, agreeing with words put in their mouths in an artful cross examination.

Finally, a word on "probable cause." While courts have resisted mightily putting a number on probable cause, *see Maryland v. Pringle*, 540 U.S. 366, 371 (2003), at bottom a review of cases indicates that there must be some, albeit inchoate, feeling as to what kind of probability constitutes probable cause. My reading is that it does not require a belief that there is more than a 50% probability of evidence being found in a particular location. *See, e.g., United States v. Gourde*, 382 F.3d 1003, 1015 (9th Cir. (2004) (collecting cases). If that were the case, one could never get a search warrant to search all three cars of a person for whom there was overwhelming evidence of general drug dealing, and specific evidence of a drug transaction the proceeds of which were now certainly in only one of three cars he owns, in different locations, and certainly in not in any of the others.

However, to be more than a hunch or a supposition, in my own mind, requires a legitimate belief that there is more than a 5 or 10 percent chance that a crime is being committed or that evidence is in a particular location. How much more is a matter that is unclear in the case law. As the Supreme Court has very recently held: "Probable cause exists when 'there is a fair probability that contraband or evidence of crime will be found in a particular place.'" *United States v. Grubbs*, --S.Ct.--, 2006 WL 693453,*3 (Mar. 21, 2006) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). This "fair probability" standard clearly describes some probability, less than a preponderance, that would "warrant a man of reasonable caution in the belief " that evidence of a crime would be found in a search. *Rodriguez*, 497 U.S. at 188. Using this standard, my judgment would be that there was probable cause to believe that criminal activity was afoot in the house, based on the information on which the officers could reasonably rely that there was not a legitimate reason for activity in the house.

Therefore, I would uphold the initial warrantless search as falling under the exigent circumstances exception.